James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

Michael Critchley, Sr.
**CRITCHLEY & LURIA, LLC**
75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 422-9200

*Attorneys for Plaintiff and the putative Class*
[Additional Attorneys on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IRVINGTON PUBLIC SCHOOLS, <br><br> Plaintiff, <br><br> v. <br><br> POWERSCHOOL HOLDINGS, INC. AND BAIN CAPITAL, LP, <br><br> Defendants. | Civil Action No. _____ <br><br><br> **COMPLAINT AND** <br> **DEMAND FOR JURY TRIAL** |

    Plaintiff Irvington Public Schools of Irvington, New Jersey brings this action against PowerSchool Holdings, Inc. and Bain Capital, LP (together, "PowerSchool" or "Defendants") to obtain damages, restitution, and/or injunctive relief for itself and on behalf of the proposed Class as defined herein. Plaintiff makes the following allegations upon information and belief, the investigation of counsel, and facts that are of public record, except as to its own allegations, which are made with personal knowledge.

## I.    INTRODUCTION

    1.    This action arises from Defendants' failure to secure the personally

identifiable information ("PII," referred to herein as "Private Information")[1] of Plaintiff's students, including their names, email addresses, phone numbers, social security numbers, medical information (*e.g.*, food allergies and learning disabilities), dates of birth, reduced meal statuses (*i.e.*, financial information), demographic information, and student and staff identification numbers.

2.      Plaintiff, a public entity that exists for the benefit of its students, entered into a valid contract (the "Contract") with PowerSchool whereby PowerSchool agreed to collect, maintain, and secure the PII of students, parents, and faculty within Plaintiff's district. PowerSchool failed to protect this information.

3.      On or about January 9, 2025, PowerSchool publicly announced that it experienced a breach of its national student information system ("SIS") as a result of a vulnerability (the "Data Breach"). Specifically, one or more unauthorized parties were able to gain access to PowerSchool's systems and data by accessing and using compromised credentials.

4.      PowerSchool failed to discover its network vulnerability and the unauthorized access to its systems until December 28, 2024. Developing evidence suggests these parties may have gained access to PowerSchool's even earlier.

5.      Preliminary reports indicate that PowerSchool failed to implement and/or improperly configured a multi-factor authentication ("MFA") protocol to ensure effective authentication and access security. At a minimum, MFA—widely recognized as a

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, but not limited to, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

necessary best practice—could have flagged or prevented unauthorized third party access through compromised credentials.

6.      PowerSchool was obligated—by its Contract, industry standards, common law, the Family Educational Rights and Privacy Act ("FERPA"), and its representations to its customers, including Plaintiff and other Class Members (defined below)—to secure their Private Information from unauthorized disclosures. Plaintiff and Class Members entrusted their Private Information to PowerSchool with the understanding that PowerSchool and any business partners to whom PowerSchool may disclose the Private Information would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

7.      Notwithstanding its obligations, it is apparent from the reported nature and extent of the Data Breach, and Defendants' response thereto, that Defendants failed to take reasonable, timely and appropriate measures to protect against the foreseeable unauthorized disclosure of Private Information.

8.      As a direct and proximate result of Defendants' failures, Plaintiff and Class Members have suffered and will indefinitely suffer serious injury. Plaintiff devoted substantial resources into discovering what data was impacted, notifying students, communicating with parents, and working to secure its students' information.

9.      Accordingly, Plaintiff, on behalf of itself and the thousands of other school districts victimized by the Data Breach, seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) because the

amount in controversy exceeds $75,000.00, and Plaintiff and Defendants are residents and citizens of different states.

11.     This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves in this District. PowerSchool contracted with Plaintiff in New Jersey and agreed to securely store Plaintiff's data. Likewise, Bain Capital, upon the acquisition of PowerSchool in 2024, inherited PowerSchool's assets and liabilities. Plaintiff's claims arise out of or relate to Defendants' purposeful availment in New Jersey. Had Defendants not contracted with, communicated, and availed itself in New Jersey, Plaintiff would not have had its data disclosed in the Data Breach. Accordingly, the exercise of personal jurisdiction here comports with traditional notions of fair play and substantial justice.

12.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

### III.  PARTIES

#### A.  Plaintiff

13.     Plaintiff Irvington Public School District of Irvington, New Jersey ("Plaintiff") is located in Essex County, New Jersey with an enrollment of over eight-thousand students.

#### B.  Defendants

14.     PowerSchool Holdings, Inc. ("PowerSchool") is a Delaware company founded in 1997 and is headquartered at 150 Parkshore Drive, Folsom, CA 95630. Defendants offers a wide range of products and services including: a Student Information

System platform; document management system; enrollment/attendance manager; recruitment platform; parent communication platform; and Naviance, a tool for planning a student's academic success, to clients in the education industry.

15.    Bain Capital, LP ("Bain Capital") is a Delaware company headquartered in Boston, Massachusetts. Bain Capital is a multi-asset investment firm with asset classes including private equity, credit, public equity, venture capital, real estate, life sciences, insurance and other areas of focus. The firm has more than 1,750 employees and approximately $185 billion in assets under management. In 2024, PowerSchool was acquired by Bain Capital. Prior to Bain Capital's acquisition, PowerSchool was accused of improperly managing and selling student data in class action lawsuit filed in California. *See Cherkin v PowerSchool Holdings, Inc.*, No. 3:24-cv-02706 (N.D. Cal.). Julie Liddell, who represents plaintiff Cherkin in this lawsuit, stated that PowerSchool and similar are companies are "data brokers — they're called identity-resolution companies — that collect information from internet users, re-identify the data, and then sell it," and that following Bain Capital's acquisition, PowerSchool "will no longer be legally bound to make even the minimum disclosures required by a public company[.]"[2]

## IV.    FACTUAL BACKGROUND

### A.    REGULATORY FRAMEWORK AND STANDARDS GOVERNING CREATION, COLLECTION, MAINTENANCE, AND USE OF PRIVATE INFORMATION

16.    Federal and state regulators have established security standards and issued guidelines and recommendations to reduce the risk of cyberattacks, data breaches, and the

---

[2] Laura Italiano, *A lawsuit accuses Bain Capital's PowerSchool of trafficking in student data. The edtech giant says everything it does is legal*, INSIDER
https://www.yahoo.com/news/lawsuit-accuses-bain-capitals-PowerSchool-102801213.html (last accessed: Mar. 21, 2025).

resulting consumer harm. There are a number of state and federal laws, requirements, and industry standards governing the creation, collection, protection, and use of Private Information.

17.    PowerSchool knew or should have known of the obligations, standards, guidelines, and recommendations with respect to their creation, collection, maintenance, protection, and use of Private Information.

### 1.    The Federal Trade Commission Act (FTCA)

18.    The Federal Trade Commission ("FTC") "works to prevent fraudulent, deceptive, and unfair practices that target businesses and consumers." The Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce."

19.    The FTC has determined that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.

20.    Consequently, the FTC has issued numerous guidelines to identify best data security practices that businesses, such as Defendant, should employ to protect against unlawful exposure of Private Information.

21.    The FTC's guidance for businesses underscores the importance of implementing and maintaining reasonable data security practices.[3] For example, the FTC offers the following general guidelines:

a.    In managing confidential information, businesses should factor

---

[3]    *Start with Security: A Guide for Business*, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/start-security-guide-business#start (last visited April 25, 2025).

security into the decision making in every department of the business—personnel, sales, accounting, information technology, etc.

b.    Don't collect personal information you don't need, and hold on to information only as long as you have a legitimate business need.

c.    Don't use personal information when it's not necessary.

d.    Use an intrusion detection system to expose a breach as soon as it occurs.

e.    Watch for large amounts of data being transmitted from the system.

f.    Have a response plan in the event of a breach.

22.    With respect to updates and patches to third-party software, the FTC states that outdated software undermines security, the solution being to update software regularly, implement third-party patches as they are issued, prioritize patches by the severity of the threat they are designed to avert, and use automated tools to track which version of software is running and whether updates are available.

23.    Consequently, the FTC strongly encourages businesses to "[p]ut procedures in place to keep your security current and address vulnerabilities that may arise," including to "[c]heck expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems."[4] The FTC's website cites an example case, wherein it charged that a business failed to patch a critical vulnerability

---

[4] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited April 25, 2025).

because its patch management policies and procedures were inadequate.

24.    With respect to security warnings in regard to vulnerabilities, the FTC cautions businesses to heed credible security warnings and move quickly to fix them. The FTC also strongly encourages businesses to "[h]ave an effective process in place to receive and address security vulnerability reports." Citing an example case, wherein the FTC charged that a business' alleged delay in responding to warnings meant that the vulnerabilities found their way onto additional devices and across multiple system versions, the FTC warns: "When vulnerabilities come to your attention, listen carefully and then get a move on."

25.    The FTC has routinely brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice prohibited by the FTCA. Orders derived from these enforcement actions explicate the measures businesses must take to satisfy obligations concerning data security.

### 2.    State Laws Concerning Private Information

26.    At least 24 states have enacted laws addressing data security practices, requiring businesses that own, license, or maintain Private Information about a resident to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

27.    Among other requirements, § 521.052 imposes certain requirements on businesses with respect to the protection of sensitive personal information including, but not limited to, that the "business shall implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by the business in

the regular course of business" and "shall destroy or arrange for the destruction of customer records containing sensitive personal information within the business's custody or control that are not to be retained by the business by (1) shredding; (2) erasing; or (3) otherwise modifying the sensitive personal information in the records to make the information unreadable or indecipherable through any means."

28.    Additionally, § 521.053 requires notification by the business to impacted individuals in the event of a breach of system security, including that the business "shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person."

29.    Pursuant to § 521.05, notification to the impacted individual "shall be made without unreasonable delay and in each case not later than the 60th day after the date on which the person determines that the breach occurred."

### 3.    Industry Standards

30.    Various cybersecurity industry best practices have been published, are readily available, and should be consulted as a go-to source for an entity instituting, developing, maintaining, or enhancing its cybersecurity standards.

31.    These practices include, across all industries encountering Private Information, education and appropriate access restriction for all personnel in regard to proper creation, collection, maintenance, and use of Protected Information; enforcing strong password and similar protections, including multi-factor authentication; applying multi-layer security measures (including firewalls, antivirus, and anti-malware software); monitoring for suspicious or irregular traffic to servers, credentials used to access servers, activity by known or unknown users, and server requests; implementing encryption to

render data unreadable without proper authorization; and regular back up of data.

32.    Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

33.    In addition to commonly recognized industry best practices, the National Institute of Standards and Technology ("NIST") and the Center for Internet Security, Inc. ("CIS")[5] have established standards for reasonable cybersecurity readiness.

34.    Recognizing that the national and economic security of the United States is dependent upon the reliable function of critical infrastructure, President Barrack Obama issued Executive Order 13636, Improving Critical Infrastructure Cybersecurity, in February 2013. Executive Order 13636 directed NIST to work with stakeholders to develop a voluntary framework—based on existing standards, guidelines, and practices—for reducing cyber risks to critical infrastructure. Created through collaboration between

---

[5] CIS is a community-driven nonprofit responsible for globally recognized best practices for securing IT systems and data, including a prescriptive, prioritized, and simplified set of best practices in cybersecurity (referred to as "CIS Controls") and consensus-based prescriptive configuration recommendations of global cybersecurity experts (referred to as "CIS Benchmarks"). Per the CI website, the CIS Controls are a general set of recommended practices for securing a wide range of systems and devices, whereas CIS Benchmarks are guidelines for hardening specific operating systems, middleware, software applications, and network devices. The need for secure configurations is referenced throughout the CIS Controls. In fact, CIS Control 4 specifically recommends secure configurations for hardware and software on mobile devices, laptops, workstations, and servers. Both the CIS Controls and the CIS Benchmarks are developed by communities of experts using a consensus-based approach. *See* https://www.cisecurity.org/controls/cis-controls-faq (last visited April 25, 2025).

industry and government, the voluntary framework promotes the protection of critical infrastructure, and provides standards, guidelines, tools, and technologies to protect information technology systems against threats to the confidentiality of information, integrity of information and processes, and availability of information and services.

35.     For example, NISTIR 8374, a NIST publication titled "Ransomware Risk Management: A Cybersecurity Framework Profile," provides the following essential ransomware tips:

    a.    Educate employees on avoiding ransomware infections.

    b.    Don't open files or click on links from unknown sources unless you first run an antivirus scan or look at links carefully.

    c.    Avoid using personal websites and personal apps—like e-mail, chat, and social media—from work computers.

    d.    Don't connect personally owned devices to work networks without prior authorization.

    e.    Avoid having vulnerabilities in systems that ransomware could exploit.

    f.    Keep relevant systems fully patched. Run scheduled checks to identify available patches to install these as soon as feasible.

    g.    Employ zero trust principles in all networked systems. Manage access to all network functions and segment internal networks where practical to prevent malware from proliferating among potential target systems.

    h.    Allow installation and execution of authorized apps only. Configure

operating systems and/or third party software to run only authorized applications.

i.      Inform your technology vendors of your expectations (*e.g.*, in contract language) that they will apply measures that discourage ransomware attacks.

j.      Quickly detect and stop ransomware attacks and infections.

k.      Use malware detection software such as antivirus software at all times. Set it to automatically scan e-mails and flash drives.

l.      Continuously monitor directory services (and other primary user stores) for indicators of compromise or active attack.

m.      Block access to untrusted web resources. Use products or services that block access to server names, IP addresses, or ports and protocols that are known to be malicious or suspected to be indicators of malicious system activity.

n.      Make it harder for ransomware to spread.

o.      Use standard user accounts with multi-factor authentication versus accounts with administrative privileges whenever possible.

p.      Introduce authentication delays or configure automatic account lockout as a defense against automated attempts to guess passwords.

q.      Assign and manage credential authorization for all enterprise assets and software, and periodically verify that each account has only the necessary access following the principle of least privilege.

r.      Store data in an immutable format (so that the database does not

automatically overwrite older data when new data is made available).

s.    Allow external access to internal network resources via secure virtual private network (VPN) connections only.

t.    Make it easier to recover stored information from a future ransomware event.

u.    Make an incident recovery plan. Develop, implement, and regularly exercise an incident recovery plan with defined roles and strategies for decision making. This can be part of a continuity of operations plan. The plan should identify mission-critical and other business-essential services to enable recovery prioritization and business continuity plans for those critical services.

v.    Back up data, secure backups, and test restoration. Carefully plan, implement, and test a data backup and restoration strategy—and secure and isolate backups of important data.

w.    Keep your contacts. Maintain an up-to-date list of internal and external contacts for ransomware attacks, including law enforcement, legal counsel, and incident response resources.

**B.    FACTUAL ALLEGATIONS**

**1.    PowerSchool's Business**

36.    Defendants' PowerSchool software is the largest provider of cloud-based education software for K-12 education in the United States, with 18,000 customers across North America, making it responsible for the Personal Information of over fifty (50) million students, teachers, and their family members in the country. PowerSchool retains

historical information of former students and teachers who previously made use of its systems, dating back to 2005.

37.     PowerSchool services its customers in more than ninety (90) countries including throughout North America—specifically, private and public schools and school districts. PowerSchool offers its school-customers a variety of products aimed at managing educational administrative tasks like enrollment, attendance, parent notifications, emergency contacts, assignments, grades, transcripts, student medical records, and staff recruitment.

38.     PowerSchool also offers a variety of cloud-software products for schools to customize to meet their needs and accomplish administrative tasks. One of PowerSchool's leading products is the PowerSchool SIS, used by at least 15,000 schools and districts across the country

39.     As part of its services, PowerSchool collects and retains a wide variety of highly sensitive Personal Information, including:[6]

   a. Name;

   b. Email Address;

   c. Social Security Number;

   d. Address;

   e. Phone Number;

   f. Emergency Contact Information;

   g. Birth Date;

   h. Age;

---

[6]     *PowerSchool's      Privacy      Principles*,      PowerSchool, https://www.PowerSchool.com/privacy/ (last visited April 25, 2025).

i.      Grade;

j.      Gender;

k.      Device Information (e.g. unique device ID, IP address, and cookies);

l.      Class Schedule;

m.      Standardized Test Scores;

n.      Grades;

o.      Allergy Information;

p.      Immunization Records; and

q.      Learning Disabilities.

40.     In short, this Personal Information is highly sensitive and can be exploited by unauthorized parties to engage in fraudulent activities such as identity theft and other forms of fraud.

### 2.      The Data Breach

41.     On December 28, 2024, PowerSchool became aware of a cybersecurity incident involving unauthorized exfiltration of certain personal information from PowerSchool Student Information System (SIS) environments through one of our community-focused customer support portals, PowerSource.[7]

42.     For involved individuals, the types of information exfiltrated in the incident included one or more of the following, which varied by person: the individual's name, contact information, date of birth, limited medical alert information, Social Security

---

[7] *Notice of Data Breach for Individuals in the United States*, PowerSchool, https://www.PowerSchool.com/security/sis-incident/notice-of-united-states-data-breach/ (last visited April 25, 2025).

Number, and other related information.[8]

43.     A March 2025 CrowdStrike forensic report confirmed the breach was caused by a compromised credential, but the root cause of how the compromised credential was acquired and used remains unknown.[9]

44.     Mark Racine, chief executive of the Boston-based education technology consulting firm RootED Solutions, told TechCrunch that while the report provides "some detail," there is not enough information to "understand what went wrong."[10]

45.     As a result of the Data Breach, PowerSchool stated that it is offering two years of complimentary identity protection services to students and educators whose information was involved. For adult students and educators, this offer will also include two years of complimentary credit monitoring services.

46.     On or about January 9, 2025, PowerSchool publicly announced the Data Breach and began sending notifications to impacted parties, such as to Plaintiff and Class Members, to advise of the Data Breach.

### 3.     Defendants Failed to Comply with Regulatory Requirements and Standards, and Breached Contracts with and Duties Owed to Plaintiff and Class Members

47.     On information and belief, PowerSchool failed to comply with the FTCA. On information and belief, Defendants failed to: heed credible security warnings; failed to maintain adequate patch management policies and procedures; failed to detect alerts regarding vulnerabilities affecting its systems; failed to properly update and patch third-

---

[8] *Id.*

[9] Carly Page, *What* PowerSchool *won't say about its data breach affecting millions of students*, TechCrunch, https://techcrunch.com/2025/03/10/what-PowerSchool-isnt-saying-about-its-massive-student-data-breach/ (last visited April 25, 2025).

[10] *Id.*

party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat; failed to properly use automated tools to track which versions of software were running and whether updates were available; failed to implement appropriate procedures to keep security current and address vulnerabilities, including failure to monitor expert websites and software vendors' websites regularly for alerts about new vulnerabilities; and failed to encrypt or otherwise adequately protect Plaintiff's and Class Members' Private Information.

48.     On information and belief, Defendants' failure to protect and safeguard the Private Information of Plaintiff and Class Members resulted in the disclosure of such information to one or more third-parties without consent, in violation of FTCA. Such disclosure was not necessary to carry out the purpose for which Defendants received the information, nor was it permitted by statute, regulation, or order.

49.     Defendants' violations of FTCA, as set forth above, were reckless or, at the very least, negligent.

50.     On information and belief, Defendants also failed to implement and comply with cybersecurity industry standards. Defendants failed to meet the minimum standards of any of the following best practices and frameworks: CIS and NIST publications (including, without limitation, "Ransomware Risk Management: A Cybersecurity Framework Profile"), the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and CIS's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness and

response.

### 4.    Defendants Breach Their Contract with Plaintiff

51.    Plaintiff and PowerSchool are parties to the Contract, the terms of which include express and implied promises that create mandatory obligations on the part of PowerSchool.

52.    The Contract included a Data Privacy Agreement ("DPA"). The DPA expressly obligated PowerSchool to do all of the following:

a.    implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk;

b.    refrain from using, selling, renting, transferring, distributing, altering, or disclosing PII to any third party without the prior written consent of Plaintiff, except as required by law or as otherwise agreed;

c.    notify Plaintiff without undue delay, and within the time period required by law, if a data breach occurred;

d.    abide by FERPA, which restricts the unauthorized sharing of student education records; and

e.    review its own data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws.

53.    Despite having represented it would do all the above, PowerSchool did not fulfill its promises. Plaintiff has accordingly been deprived of the full benefit of the bargain.

**5.    The Private Information Accessed in the Date Breach is Highly Valuable**

54.     The Private Information of students is an extraordinarily valuable and, consequently, a frequent intentional target of cybercriminals.

55.     The value of Private Information is axiomatic, considering the value of "big data" in corporate America and the fact the consequences of cybercrimes include heavy criminal penalties. The risk-to-reward analysis illustrates that Private Information has considerable market value.

56.     Indeed, the U.S. Attorney General confirmed in 2020 that "hackers" target consumers' sensitive personal information because it "has economic value."[11]

57.     Numerous sources cite "dark web" pricing for stolen Private Information.[12]

58.     According to various sources, Private Information can be sold at prices ranging from $40.00 to $200.00 per record, bank details can be sold at prices ranging from

---

[11] *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice (February 10, 2020), available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited April 25, 2025).

[12] The Dark Web is defined as follows:

> Many academics and security professionals understand the term '*Dark Web*' generally to describe web services hosted on the Tor Network. These *hidden services* (now called *onion services*) use a so-called onion address to allow users to connect anonymously and also allow the website itself to hide its location and identity from the users, making them very difficult to shut down or censor. Most sites hosted on the Tor network are "legitimate" services seeking to resist censorship, such as blogs, wikis, and newspapers; a relatively small number function as marketplaces for illegal goods, host discussion forums for illegal communities, or provide the technology for sites whose content is so controversial or objectionable that most hosting providers wouldn't knowingly provide them space to host themselves.

*See* Ben Collier, *Tor: From the Dark Web to the Future of Privacy*, Ch. 7, at 124 (MIT Press, Apr. 16, 2024).

$50.00 to $200.00 per record,[13] and a stolen credit or debit card number can sell for $5.00 to $110.00.[14]

59.    In addition, criminals can purchase access to the entirety of a company's breached database on the dark web,[15] and would expect a sale price of $999.00 to $4,995.00.[16]

60.    Relatively basic information such as names, e-mail addresses, and phone numbers, have value to cybercriminals. In addition to practices such as "spamming" customers or launching "phishing" attacks using compromised names and e-mails, cybercriminals routinely combine this information with other compromised data to build a more complete profile of an individual. As reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing e-mails," it is often such consumer profiling that enables cybercriminals to successfully carry out additional phishing attacks or social engineering attacks.[17]

---

[13] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (October 16, 2019), *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ (last visited April 25, 2025).

[14] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (December 6, 2017), *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is- selling-for-on-the-dark-web/ (last visited Jan. 31, 2024).

[15] *See, e.g., In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymousbrowsing/in-the- dark/ (last visited April 25, 2025)*; Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct.16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ (last visited April 25, 2025).

[16] *In the Dark*, VPNOverview (2019), *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited April 25, 2025).

[17] *See Dark Web Price Index: The Cost of Email Data*, available at https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last

61.     There is often a substantial time lag between when a harm occurs as the result of a breach and when the harm is discovered, as well as substantial lag time between when Private Information is compromised and when it is used. According to the U.S. Government Accountability Office,[18] which performed a comprehensive analysis of data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

62.     In any event, once cybercriminals compromise Private Information, they often trade the information on the "cyber black market" for many years.

### 6.     The Data Breach was a Foreseeable Risk

63.     It is well known that entities involved in the routine creation, collection, maintenance, and use of Private Information, are at a heightened risk of a cyberattack.

64.     At all relevant times, PowerSchool's susceptibility to a cyberattack was or reasonably should have been known and obvious to Defendants.

65.     At all relevant times, PowerSchool was or should have been aware of the significant number of individuals whose Private Information PowerSchool created, collected, and stored and, thus, the significant number of individuals who would be harmed by unauthorized access to its systems.

66.     At all relevant times, PowerSchool was or should have been aware that the

---

visited April 25, 2025).

[18] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office (June 4, 2007), available at: https://www.gao.gov/products/gao-07-737 (last visited April 25, 2025).

Private Information of Plaintiff's students and Class Members was an attractive target for malicious actors.

67.     At all relevant times, PowerSchool knew or reasonably should have known of the importance of safeguarding Private Information and the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on affected individuals as a result of the breach.

68.     PowerSchool's failure to safeguard Private Information is exacerbated by repeated warnings and alerts directed at protecting and securing sensitive data. Indeed, data breaches, such as the one experienced by PowerSchool have become so notorious that the FBI, U.S. Secret Service, and other authorities have issued warnings to potential targets so they are aware of, can prepare for and, hopefully, are able to ward off a potential attack.

69.     As early as 2011, the FBI issued warnings regarding the advancement in cybercriminals' ability to attack systems remotely and exploit them to obtain Private Information. This warning was not only a prediction of the general escalation of cybercrime, but also a clear indication to entities such as PowerSchool of the impending risks associated with storing and handling sensitive data.[19]

70.     In addition, trends in cybercrime have demonstrated an alarming increase in the frequency and sophistication of attacks. These attacks include, without limitation, attacks on the following entities: Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020),

---

[19] Gordon M. Snow, *Statement before the House Financial Service Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cybersecurity-threats-to-the-financial-sector (last visited April 25, 2025).

and Advanced Info Service (8.3 billion records, May 2020). Thus, PowerSchool knew or should have known that cybercriminals would target the Private Information that it collected and maintained.

71.     The continual increase in data breaches underscored the necessity for PowerSchool to implement advanced security measures, such as robust encryption, regular security audits, and comprehensive employee training on cybersecurity.

72.     Based on the foregoing, PowerSchool knew or should have known that its data systems would be targeted by cybercriminals and had an obligation and duty to take all reasonable means to protect Private Information from attacks such as the Data Breach here.

73.     Notwithstanding the common knowledge of, and the prevalence of public announcements and abundance of other publicly available resources with respect to, the imminent and serious threat of unauthorized access to Private Information, and despite its creation, collection, maintenance, and use of Private Information of millions of individuals, Defendants failed to use reasonable care in maintaining the privacy and security of Plaintiff's students and Class Members' Private Information. Had Defendants implemented adequate security measures, cybercriminals never could have accessed Private Information for millions of Defendants' customers and the Data Breach would have been prevented or, at a minimum, of a much smaller scope.

        **7.      The Data Breach Harmed and Will Continue to Harm the Class**

74.     Victims of data breaches are exposed to serious ramifications. Indeed, the reason why cybercriminals steal sensitive information is to monetize it.

75.     Cybercriminals monetize stolen personal identification, health, and financial information by selling, on the black market, the spoils of their cyberattacks to

identity thieves and other criminals to extort and harass victims or assume the victims' identities to engage in illegal financial transactions under the victims' names.

76.     Victims of identity theft also routinely suffer embarrassment, harassment, or blackmail, in person or online, and/or experience financial losses (*e.g.*, unauthorized account transactions and credit downgrades) resulting from, by way of example, fraudulently opened accounts or misuse of existing accounts.

77.     The unencrypted Private Information of Plaintiff's students will end up (to the extent that it has not already ended up) for sale on the dark web, as that is the modus operandi of cybercriminals.

78.     Given the type and scope of this targeted attack, the sophisticated cybercriminal activity, the volume of data compromised, and the sensitive type of Private Information involved in this Data Breach, entire batches of stolen information have undoubtedly been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes, including opening financial and other accounts in the consumer's name to make purchases or to launder money; filing of fraudulent tax returns; taking of loans or lines of credit; or filing of false unemployment or similar claims.

79.     Unencrypted Private Information may also fall into the hands of other entities that will use the detailed Private Information for targeted marketing without the approval of Plaintiff's students.

## V.    CLASS ALLEGATIONS

80.     Plaintiff brings this class action individually on behalf of itself and on behalf of all members of the following class and subclass (collectively, the "Classes") of similarly situated entities pursuant to Federal Rule of Civil Procedure 23. As described below, this

action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)).

81. Accordingly, Plaintiff seeks certification under Federal Rule of Civil Procedure 23 of the following Classes and Subclasses:

82. **Nationwide Class:** All school districts in the United States whose students' Private Information was exposed, accessed, and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

83. **New Jersey Subclass:** All school districts in New Jersey whose students Private Information was exposed, accessed, and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

84. Excluded from the Classes are (1) Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entity in which Defendants has a controlling interest; (2) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (3) those persons who have suffered personal injuries as a result of the facts alleged herein (4) any and all federal, state, or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions; and (5) all judges presiding over this matter or assigned to hear any aspect of this litigation, along with judicial clerks and staff, and immediate family members.

85. Plaintiff reserves the right to modify or amend the foregoing Class and Subclass definitions before the Court determines whether certification is appropriate.

86. This action has been brought and may properly be maintained as a class

action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and membership in the proposed Classes is readily ascertainable.

87.    **Numerosity (Federal Rule of Civil Procedure 23(a)(1)):** A class action is the only available method for the fair and efficient adjudication of this controversy. The members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is neither practicable nor possible. Plaintiff is informed and believes and, on that basis, alleges that the total number of Class Members is in the millions of individuals. Membership in the Class will be determined by analysis of Defendants' records.

88.    **Commonality (Federal Rule of Civil Procedure 23(a)(2) and (b)(3)):** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, Plaintiff and Class Members share a community of interest in that there are numerous common questions and issues of law and fact which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

      a.    Whether Defendants owed a duty to Plaintiff and Class Members to safeguard the Private Information it maintained;

      b.    Whether Defendants owed a duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

      c.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's students and Class Members' Private Information;

      d.    Whether Defendants was negligent in maintaining, protecting, and securing Private Information;

      e.    Whether Defendants was negligent in failing to adequately monitor

and audit the data security systems;

f.    Whether Defendants breached its duty to Plaintiff and Class Members to safeguard the Private Information it maintained;

g.    Whether Defendants failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

h.    Whether Defendants failed to take reasonable and prudent security measures;

i.    Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.    Whether Defendants' security measures to protect its systems were reasonable in light of known legal requirements;

k.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

l.    Whether Defendants violated state consumer protection and state information privacy laws in connection with the actions described herein;

m.    Whether Defendants violated federal statutes including, but not limited to, FTCA;

n.    Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's students and Class Members' Private Information;

o.    Whether Defendants knew or should have known that its data

security systems and monitoring processes were deficient;

p.    Which security procedures and notification procedures Defendants should be required to implement;

q.    Whether Defendants was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

r.    Whether Defendants' conduct, including its alleged failure to act, resulted in or was the proximate cause of the Data Breach and/or loss of Private Information of Plaintiff's students and Class Members;

s.    Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their Private Information; and

t.    Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

89.    In the alternative, Plaintiff seeks certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

90.    **Typicality (Federal Rule of Civil Procedure 23(a)(3)):** Plaintiff's claims are typical of the claims of the Classes. Plaintiff's students and Class Members' Private Information was in Defendants' possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff sustained damages, akin to damages sustained by Class Members, arising out of and caused by Defendants' common course of

conduct in violation of laws and standards, as alleged herein.

91. **Adequacy (Federal Rule of Civil Procedure 23(a)(4)):** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of each of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiff is not subject to any individual defense unique from those conceivably applicable to other Class Members or the Classes in their entirety. Plaintiff anticipates no management difficulties in this litigation. Plaintiff has no conflicts of interest with the Classes. Plaintiff's Counsel is competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

92. **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3)):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation predominate over individual issues. The issues discussed above in regard to commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also

burden and unreasonably strain the court system, and would result in undue delay. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

93.     **Ascertainability:** The Class and Subclasses are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class. Defendants has access to names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach.

94.     **Injunctive and Declaratory Relief:** This class action is also appropriate for certification because Defendants has acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate concerning the Classes in their entireties. Defendants' policies and practices challenged herein apply to and affect Class Members uniformly. Plaintiff's challenge of these policies and procedures hinges on Defendants' conduct concerning the Classes in their entirety, not on facts or law applicable only to Plaintiff. Unless a Class-wide injunction is issued, Defendants may continue failing to properly secure Class Members' Private Information, and Defendants may continue to act unlawfully, as set forth in this Complaint. Further, Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under F.R.C.P. Rule 23(b)(2).

## VI.    <u>CLAIM FOR RELIEF</u>

### <u>COUNT ONE — BREACH OF CONTRACT</u>

95.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 94 above and incorporates the same as if set forth herein.

96.    Plaintiff brings this Count on behalf of the Nationwide Class, or in the alternative, on behalf of the Statewide Subclass.

97.    Plaintiff entered into an express contract with PowerSchool when it subscribed or purchased services from PowerSchool and provided their students' PII to PowerSchool.

98.    By collecting PII from its customers, PowerSchool impliedly agreed to safeguard and protect the PII of Plaintiff and to timely and accurately notify them if their PII was breached or compromised. Plaintiff believed that PowerSchool would use part of the monies paid to PowerSchool under the agreements or the monies obtained from PowerSchool's use of the PII to fund proper and reasonable data security practices. Plaintiff would have paid less for PowerSchool products or services in the absence of the express contract or express or implied terms between it and PowerSchool. The safeguarding of the PII of Plaintiff was critical to realize the intent of the parties.

99.    Specifically, PowerSchool agreed and expressly stated in all applicable Privacy Policies that, in exchange for Plaintiff's PII, PowerSchool would, among other obligations, maintain safeguards designed to protect the PII it collected, limit access to the PII to necessary personnel, and give timely and accurate notification if a breach occurs.

100.    Plaintiff fully performed their obligations under the express and/or implied agreements with PowerSchool by providing their PII and making relevant payments.

101.    PowerSchool materially breached its express and/or implied agreement with

Plaintiff by failing to protect its PII. Specifically, it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) allowed PII to be disclosed to unauthorized third parties; (3) failed to timely notify Plaintiff of the Breach; and (4) failed to provide adequate information regarding the Breach in order for Plaintiff to undertake proper precautionary measures, in violation of the Agreements.

102.    As a direct and proximate result of PowerSchool's breach of the express and/or implied agreements, Plaintiff has been injured and are entitled to damages in an amount to be proven at trial.

## COUNT TWO — NEGLIGENCE

103.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 94 above and incorporates the same as if set forth herein.

104.    Plaintiff brings this Count on behalf of the Nationwide Class under the laws of the state of New Jersey, or in the alternative, on behalf of the Statewide Subclass.

105.    PowerSchool required Plaintiff to submit sensitive PII in order to use PowerSchool's products and services and also collected and stored sensitive personal information about its customers on its own, either automatically as customers used PowerSchool's products and services, or through third-party data sources.

106.    PowerSchool had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff could and would suffer if the PII were wrongfully disclosed.

107.    PowerSchool owed a duty to Plaintiff to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PII in its possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing PowerSchool's security systems to ensure that Plaintiff's and

Class Members' PII in PowerSchool's possession was properly secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusion to its networks; (d) maintaining security measures consistent with industry standards discussed herein; and (e) failing to delete customer PII that PowerSchool no longer reasonably needed to keep, particularly as to former customers.

108.    PowerSchool holds itself out as a protector of consumer data, and thereby assumes a duty to reasonably protect the data that was provided to it by Plaintiff. Because of its role as one of the largest telecommunications companies, PowerSchool was in a unique and superior position to protect against the harm suffered by Plaintiff as a result of the PowerSchool Data Breach.  PowerSchool's own privacy policies set forth some of the duties it assumed when obtaining customers' PII.

109.    PowerSchool's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII by companies such as PowerSchool. Various FTC publications and data security breach orders and Consent Decrees further form the basis of PowerSchool's duty.

110.    PowerSchool violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. PowerSchool's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs

and the Classes. Thus, PowerSchool's violation of Section 5 of the FTC Act and similar statutes constitutes negligence.

111.    PowerSchool had common law duties to prevent foreseeable harm to Plaintiff. These duties existed because Plaintiff was the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff would be harmed by PowerSchool's failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes and had targeted PowerSchool's data systems prior to the Data Breach.

112.    PowerSchool's duty to use reasonable security measures also arose as a result of the special relationship that existed between PowerSchool, on the one hand, and Plaintiff, on the other hand. The special relationship arose because Plaintiff entrusted PowerSchool with their PII as part of the purchase of and subsequent use of the products and services PowerSchool. PowerSchool alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach.

113.    PowerSchool breached the duties it owed to Plaintiff described above and thus was negligent. PowerSchool breached these duties by, among other things, failing to: (a) exercise reasonable care and implement proper security systems, protocols and practices sufficient to protect the PII of Plaintiff; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards during the period of the Data Breach; (d) comply with federal regulations protecting the PII at issue during the period of the Data Breach; (e) disclose in a timely and adequate manner that Plaintiffs' and Class Members' PII in PowerSchool's possession had been, or was reasonably believed to have been, stolen or compromised; and (f) delete customer PII that PowerSchool no

longer reasonably needed to keep, particularly as to its former students.

114.    Plaintiff was a foreseeable victim of PowerSchool's inadequate data security practices, and it was also foreseeable that PowerSchool's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff as described in this Complaint.

115.    Defendant's duty extended to protecting Plaintiff from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

116.    PowerSchool's failure to take proper security measures to protect the sensitive PII of Plaintiff created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiffs' and Class Members' PII.

117.    As a direct and proximate result of PowerSchool's negligence, Plaintiff has been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: mitigation expenses and time spent on credit monitoring, identity theft insurance; expenses and time spent initiating fraud alerts; lost work time; lost value of the schools' reputation; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of PowerSchool's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other

economic and non-economic harm.

## COUNT THREE – UNJUST ENRICHMENT

118.   Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 94 above and incorporates the same as if set forth herein.

119.   Plaintiff brings this Count in the alternative to the breach of contract claims above on behalf of the Nationwide Class under New Jersey common law, or in the alternative, on behalf of the Statewide Subclass.

120.   Plaintiff entrusted its PII to PowerSchool to facilitate their receipt of services and direct benefits from PowerSchool.

121.   PowerSchool understood and appreciated that the PII pertaining to Plaintiff was private and confidential and that its value depended upon PowerSchool maintaining the privacy and confidentiality of that PII.

122.   PowerSchool did not take adequate measures or protections to prevent the kind of data breach that gives rise to this litigation, even when such PII was no longer useful to PowerSchool's provision of services and direct benefits to Plaintiff.

123.   It is inequitable, unfair, and unjust for PowerSchool to retain the profits it wrongfully obtained by its retention and use of the PII of Plaintiff, and its retention of such profits violates fundamental principles of justice, equity, and good conscience.

124.   PowerSchool is therefore liable to Plaintiff for restitution or disgorgement of such unjustly accrued profits.

## COUNT FOUR – REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201, *et seq.*,

125.   Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 94 and incorporates the same as if set forth herein.

126.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

127.    An actual controversy has arisen in the wake of the Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and PowerSchool's failure to maintain data security measures that effectively protect Plaintiff from further data breaches that compromise their PII. Plaintiffs continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future given the nature and quantity of the PII stored by PowerSchool and PowerSchool's failure to maintain adequate data security measures resulting in numerous data breaches, as described in detail herein.

128.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    PowerSchool continues to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes;

b.    PowerSchool continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII; and

c.    As a result of PowerSchool's ongoing breach of this legal duty, Plaintiff remain subject to continuing and imminent risk of harm.

129.    The Court also should issue corresponding prospective injunctive relief

requiring PowerSchool to employ proper security protocols consistent with law and industry standards to protect consumers' PII.

130.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at PowerSchool. The risk of another such breach is real, immediate, and substantial. If another breach at PowerSchool occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

131.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to PowerSchool if an injunction is issued.

132.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PowerSchool, thus eliminating the additional injuries that would result to Plaintiffs and the thousands of school districts whose PII would be further compromised.

## VII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    A judgment against Defendants for the damages sustained by Plaintiff, and for any additional damages, penalties, and other monetary relief provided by applicable law;

B.    An order providing injunctive and other equitable relief as necessary to protect the interests of Plaintiff and its students;

C.    By awarding Plaintiff prejudgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after service of this Complaint;

    D.      The costs of this suit, including reasonable attorney fees; and

    E.      Such other and further relief as the Court deems just and proper.

## VIII. <u>JURY TRIAL DEMANDED</u>

Plaintiff requests a jury trial, under Federal Rule of Civil Procedure 38, on all claims so triable.

DATED: April 25, 2025                Respectfully submitted,

                                */s/ James E. Cecchi*
                                James E. Cecchi (030861989)
                                Michael A. Innes (032492008)
                                Jordan M. Steele (389962025)
                                **CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
                                5 Becker Farm Road
                                Roseland, New Jersey 07068
                                Telephone: (973) 994-1700
                                jcecchi@carellabyrne.com
                                minnes@carellabyrne.com
                                jsteele@carellabyrne.com

                                Michael Critchley, Sr. (251821972)
                                Michael Critchley, Jr. (055861994)
                                **CRITCHLEY & LURIA, LLC**
                                75 Livingston Avenue
                                Roseland, New Jersey 07068
                                Telephone: (973) 422-9200
                                mcritchley@critchleylaw.com
                                mcjr@critchleylaw.com

                                Jason Alperstein (*pro hac vice forthcoming*)
                                **CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
                                2222 Ponce De Leon Blvd.
                                Miami, Florida 33134
                                Telephone: (973) 994-1700
                                jalperstein@carellabyrne.com

                                Gary M. Klinger  (*pro hac vice forthcoming*)
                                **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                227 W. Monroe Street, Suite 2100
                                Chicago, Illinois 60606

Telephone: (866) 252-0878
gklinger@milberg.com

Jeff Ostrow (*pro hac vice forthcoming*)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
ostrow@kolawyers.com

*Attorneys for Plaintiff and the putative Class*